**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **ARAMARK SERVICES, INC. f/k/a ARAMARK CORPORATION; ARAMARK SERVICES, INC. GROUP HEALTH PLAN; ARAMARK UNIFORM SERVICES GROUP HEALTH AND WELFARE PLAN; and ARAMARK BENEFITS COMPLIANCE REVIEW COMMITTEE,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**AETNA LIFE INSURANCE COMPANY,**<br><br>**Defendant.** | No.  2:23-cv-00446 |

**FIRST AMENDED COMPLAINT**

Plaintiffs Aramark Services, Inc. f/k/a Aramark Corporation; Aramark Services, Inc. Group Health Plan; Aramark Uniform Services Group Health and Welfare Plan; and Aramark Benefits Compliance Review Committee (collectively, "Aramark" or "Plaintiffs") through their undersigned counsel, submit this First Amended Complaint against Defendant Aetna Life Insurance Company ("Aetna" or "Defendant"), and allege as follows:

**PRELIMINARY STATEMENT**

1.     Aramark is a provider of food services, facilities, and uniform services to universities, school systems, prisons, healthcare facilities, and other businesses nationwide.  In 2017, Aramark hired Aetna to administer the Aramark Services, Inc. Group Health Plan and

Aramark Uniform Services Group Health and Welfare Plan (the "Plans") covering Aramark's tens of thousands of employees nationwide, as well as their family members ("Plan Participants").

2.      Aetna leveraged its role as the third-party administrator or "TPA" to enrich itself to Aramark's detriment.  Aetna breached its fiduciary duties and engaged in prohibited transactions.

3.      Aetna serves as the intermediary between Aramark and the health care providers who treat and care for Plan Participants.  In exchange for a monthly fee, Aetna provides access to its network of providers and adjudicates claims for payment submitted by those providers.  In other words, Aetna decides which claims should be paid and how much to pay.

4.      Since the beginning of 2018, Aetna has taken more than $200 million from Aramark to pay providers for medical services provided to Plan Participants.  Included in that over $200 million, Aetna (a) paid millions of dollars in provider claims that never should have been paid, (b) wrongfully retained millions of dollars in undisclosed fees, and (c) engaged in claims-processing related misconduct to Aramark's detriment.

5.      Aetna is a fiduciary under the Employee Retirement Insurance Security Act of 1974 ("ERISA").  Aetna owes ERISA-imposed fiduciary duties to Aramark.  Its conduct breached those duties.

6.      Aramark brings this action seeking equitable relief for harm caused by Aetna's wrongful conduct.

## PARTIES

7.      Plaintiff Aramark Services, Inc. is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.

8.      Aramark Services, Inc. sponsors and is the principal funding source for the Plans, which are welfare benefit plans organized and operated under ERISA.

1

9.     Plaintiffs Aramark Services, Inc. Group Health Plan and the Aramark Uniform Services Group Health and Welfare Plan are welfare benefit plans organized and operated under ERISA.

10.    Plaintiff Aramark Benefits Compliance Review Committee is the benefits committee established by Aramark Services, Inc. to act as administrator and a fiduciary of the Plans.

11.    Defendant Aetna Life Insurance Company is a Connecticut corporation with its principal place of business in Hartford, Connecticut.

## JURISDICTION AND VENUE

12.    Pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331, this Court has jurisdiction over the claims asserted in this Complaint.

13.    The Court has personal jurisdiction over Aetna because, at all times relevant to the claims asserted herein, Aetna conducted business in the State of Texas within the meaning of the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.  Aetna's contacts with the State of Texas include, but are not limited to:

a.     In 1909, Aetna registered with the Texas Department of Insurance to operate in Texas (including this District).  The Texas Department of Insurance licensed Aetna to offer health insurance products in the State (and accident and life insurance and variable annuities).  Aetna has license number 400.  Since receiving its license in 1909, Aetna has operated continuously in Texas;

b.     As of 2021, the Texas Department of Insurance reported that Aetna was the 6th largest insurer in the State with a market share of 4.90% and reported

premium intake of $2,496,755,048.[1]  Neither the market share nor premium revenue include the market share or premiums of other companies that may be affiliated with Aetna;

c.    Aetna has multiple offices in Texas and within the District;

d.    Aetna has contractual relationships with hundreds, if not thousands, of doctors, hospitals, and other healthcare providers that care for and treat patients in Texas and the District, ranging in size from large hospital systems to single doctor practices (generally, those who render health care will be referred to as "providers");

e.    Aetna provides medical and dental insurance coverage to thousands of families and individuals who reside in Texas in the District;

f.    Aetna has contractual relationships with hundreds of employers and plan sponsors that are based in, operating in, have employees working in, or have employees residing in Texas in the District; and

g.    Aetna provides and has provided medical and dental coverage to Aramark employees and their families in Texas in the District.

14.    By agreeing to contract, adjudicate, and transmit payment for medical treatment and dental care of Aramark employees, retirees, and beneficiaries residing in Texas, and for medical and dental services rendered in Texas, Aetna has purposefully availed itself of the privilege of conducting business within Texas.  Over an 18-month period, Aetna processed more than 50,000 Aramark medical claims submitted in the State of Texas and paid more than 4,000 different Texan medical providers for those claims.

---

[1] *See* Top 40 List of Insurers in Texas, available at https://www.tdi.texas.gov/company/top40.html.

15.     Aetna has previously filed complaints and prosecuted claims in this District.  Aetna has previously been sued in this District and did not object to jurisdiction or venue.

16.     For the reasons stated above, venue is also proper in this District pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(2).[2]

## BACKGROUND

17.     Aramark lacks the expertise to evaluate claims for payment submitted by doctors and hospitals—a process called claims adjudication.  Aramark contracted that responsibility to Aetna when it became one of the Plans' TPAs in 2018, pursuant to a competitive request for proposal process.  Aramark was assisted in that competitive request for proposal process by best-in-class benefits consultants and related professionals.  Aramark selected Aetna as one of the Plans' TPAs and fiduciaries because Aetna represented its expertise evaluating payment claims submitted by providers for adherence to the Plans' coverage and reimbursement policies and industry-standard coding guidelines dictated by the Centers for Medicare and Medicaid Services ("CMS") and the American Medical Association ("AMA"), among others.

18.     As a TPA, Aetna does not provide traditional medical insurance to Aramark employees or retirees.  Aetna does not pay medical expenses for participants of the Plans in exchange for premiums.  Rather, Aramark retains the financial risk of increased medical expenses among its beneficiaries and participants by funding the medical expenses incurred by the Plans' beneficiaries using funds allocated from Aramark for that purpose.  In other words, Aramark self-

---

[2] The Agreement contains an arbitration clause that excludes equitable claims, like ERISA claims, from the scope of any arbitration and a forum selection clause that applies only to state law claims. *See Grp. 1 Auto., Inc. v. Aetna Life Ins. Co.*, No. 4:20-CV-1290, 2020 WL 4004604 (S.D. Tex. July 15, 2020).

4

funds its employees' medical expenses (with contributions from some employees in certain circumstances).

19.     The January 1, 2018 Master Services Agreement No. 700141 (the "Agreement") identifies Aetna as a fiduciary:

> Aetna . . . will discharge [its] obligations under this Agreement with that level of reasonable care which a similarly situated services provider or plan administrator, respectively, would exercise under similar circumstances.  If the Customer delegates claim fiduciary duties to Aetna pursuant to the applicable schedule, *Aetna shall observe the standard of care and diligence required of a fiduciary under ERISA Section 404(a)(1)(B)* (emphasis added).

20.     Aetna's decision-making authority under the Agreement went far beyond mere application and compliance with its own guidelines.  Because Aetna exercises discretionary authority and control respecting management of the Plans and the disposition of the Plans' assets, in addition to being a named ERISA fiduciary, Aetna is also a functional fiduciary.

21.     As a fiduciary, Aetna agreed to provide "Claim Services" for the Plans. Specifically, and by way of example, Aetna agreed to "process claims for Plan benefits . . . using Aetna's normal claim determination, payment, and audit procedures and applicable cost control standards in a manner consistent with the terms of the Plan(s), any applicable provider contract, and the Agreement."

22.     As a fiduciary, Aetna agreed to be responsible for processing and reviewing claims for health benefits by Plan Participants, including: (i) the eligibility of each claimant under the terms of the Plan, and (ii) the eligibility of the claim for health benefits under the terms of the Plan.

23.     As a fiduciary, Aetna agreed to be responsible for the approval and payment of only those claims that are legitimate, *i.e.*, not those that are fraudulent or otherwise improper and otherwise fail to satisfy the requirements of the Plans.  All other claims for payment must be denied.  The Agreement provides:

Aetna shall provide Plan Participants with access to Aetna's network hospitals, physicians and other health care providers ("Network Providers") who have agreed to provide services at agreed upon rates and who are participating in the applicable Aetna network covering the Plan Participants. . . . Contracted rates with Network Providers may be based on fee-for-service rates, case rates, per diems and in some circumstances, include performance-based contract arrangements, risk-adjustment mechanisms, quality incentives, pay-for-performance and other incentive and adjustment mechanisms.

24.    Aetna likewise exercises discretion with respect to recovery of overpayments on medical claims.  As a fiduciary, Aetna has an affirmative obligation to seek recovery of any fraudulent, illegitimate, or erroneous payments Aetna makes on the Plans' behalf.

Aetna shall reprocess any identified errors in Plan benefit payments (other than errors Aetna reasonably determines to be *de minimis*) and seek to recover any resulting overpayment by attempting to contact the party receiving the overpayment twice by letter, phone, or email.  The Customer may direct Aetna not to seek recovery of overpayments from Plan Participants, in which event Aetna will have no further responsibility with respect to those overpayments.  The Customer shall reasonably cooperate with Aetna in recovering all overpayments of Plan benefits. . . . The Customer may not seek recovery of overpayments from network providers, but the Customer may seek recovery of overpayments from other third parties once the Customer has provided Aetna notice that it will seek such recovery and Aetna has been afforded a reasonable opportunity to recover such amounts. Aetna has no duty to initiate litigation to pursue any overpayment recovery.

25.    As a fiduciary, Aetna also agreed to be responsible for providing subrogation and reimbursement services.   Under the Agreement, Aetna undertook the obligation to pursue reimbursement of monies legally owed to the Plans.

Aetna has the exclusive discretion to: (a) decide whether to pursue potential recoveries on subrogation/reimbursement claims; (b) determine the reasonable methods used to pursue recoveries on such claims, except with respect to initiation of formal litigation; and (c) decide whether to accept any settlement offer relating to a subrogation/reimbursement claim.   Aetna shall advise the Customer if the pursuit of recovery requires initiation of formal litigation. In such event, the Customer shall have the option to approve or disapprove the initiation of litigation. Subrogation /reimbursement services will be delegated to an organization of Aetna's choosing.

Aetna's discretion, however, is not unbounded.  Rather, it must exercise its discretion as an ERISA fiduciary.

26.     Aramark is entirely at Aetna's mercy when it comes to the administration of its claims.  Aramark has no role in Aetna's decision to approve or deny claims.  Aramark also has no role in Aetna's decision to pay any particular amounts for approved claims.  Aetna is uniquely positioned to make and exercise discretionary authority or control over plan management, including the right to change unilaterally the value of a fee or rate.  Aetna is further provided broad flexibility in determining its course of action in administering the Plans.  Aramark relies on Aetna to process, review, and adjudicate claims for health benefits properly.  Aetna is authorized to pull from the Plans only the amount of money that is actually paid to providers.

27.     Various courts have found Aetna to be an ERISA fiduciary when acting as a TPA in a role comparable to that it serves for Aramark.  Aetna has also represented to judicial officers in other proceedings that, when acting as a TPA, Aetna is an ERISA fiduciary.  *See, e.g.*, *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1033 (9th Cir. 2000) ("We agree with Aetna that the company qualifies as a fiduciary for purposes of the statute.  When an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA 'fiduciary' under 29 U.S.C. § 1002(21)(A)(iii)."); *see also In re Omnicom Grp. Inc. Erisa Litig.*, No. 1:20-cv-4141, 2022 WL 18674830, at *15 (S.D.N.Y. Dec. 23, 2022) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271–72 n.8 (2d Cir. 1982)) ("Under ERISA, the duties owed by fiduciaries to plan participants and beneficiaries 'are those of trustees of an express trust—the highest known to the law.'").

28.     As a fiduciary of the Plans, Aetna has a fiduciary duty to exercise "care, skill, prudence and diligence" to identify, deny, and prevent the payment of false, fraudulent, or improper provider-submitted claims or other claims that do not satisfy the eligibility and other requirements of the Plans.

7

29.     As a fiduciary, Aetna is also prohibited from siphoning funds, effectively undisclosed fees, from the Plans under the false pretenses that it is paying claims while extracting undisclosed fees from the funds intended to pay medical services.

30.     Aetna has breached its fiduciary duties by approving and paying false, fraudulent, and improper claims and withdrawing undisclosed fees from the funds Aetna extracts from the Plans to pay those providers that cared for and treated Plan Participants.

31.     Notwithstanding its fiduciary obligations to "aggressively investigat[e] all types of fraud using the latest detection, investigation, and recovery techniques"—which it does for claims under its own, fully-insured plan, as discussed below—Aetna approved and paid with the Plans' assets millions of dollars of claims that never should have been paid.  In most instances, the wrongfully paid claims were paid automatically, almost immediately, and with no human review.

## AETNA'S WRONGFUL CONDUCT

### A.     Aetna Does Not Give Aramark Its Own Medical Claims Data

#### 1.     Administrative Simplification and Standard Transaction Basics

32.     Federal regulations require that participants in the health care system, *e.g.*, providers, health plans, and insurers, exchange information regarding enrollment, eligibility, billing, claim status, adjustments, adjudication, and payment using specifically defined electronic data sets.  Claim processing and payment is governed by the Health Insurance Portability and Accountability Act ("HIPAA") Administrative Simplification regulations.  *See* 45 C.F.R. § 162.920(a).  HIPAA requires "covered entities" to comply with all HIPAA transaction standards, operating rules, and code sets.  *See* 45 C.F.R. §§ 160.103, 162.100.  Aetna is a "covered entity" as that term is defined in Title 45 of the Code of Federal Regulations.  These regulations require that the electronic data sets be used to send and receive the medical claims data in the X12 5010

8

standard.  The Department of Health and Human Services has adopted the following EDI data set standards by regulation:

33.    *Eligibility and Benefits [270 and 271 transactions].*   "The request transaction, known as the X12 5010 270 transaction for inquiries about eligibility and benefits, . . . can be sent from a health care provider to a health plan, or from one health plan to another[.]  The response transaction, known as the X12 5010 271 transaction for health plan, responds to inquiries about eligibility/benefits[.]"  *See* Health Plan Eligibility and Benefits Transaction Basics, available at https://www.cms.gov/files/document/health-plan-eligibility-and-benefits-transaction-basics.pdf ("These standards apply to all HIPAA-covered entities—health plan (including Medicare and Medicaid), clearinghouses, and certain health care providers that conduct the adopted transactions electronically—not just those that work with Medicare or Medicaid.").

34.    *Payment / Invoicing / Coordination of Benefits [837 transaction].*  The 837 file is the electronic invoice that the medical provider submits to the insurance company for reimbursement.  The 837 contains information on insurance claims and includes data about the patient's treatments (such as the healthcare services delivered), the cost of medical care, and any modifications.

35.    HHS adopted the X12 837 standard for coordination of benefits ("COB").  This standard applies to all HIPAA-covered entities—health plans, clearinghouses, and providers.  The 837 standard supports two options for conducting COB transactions: either between health plans and other payers, or from health care providers to health plans.  *See* Coordination of Benefits Transactions Basics, available at https://www.cms.gov/files/document/coordination-benefits-transactions.pdf.

36.     *Claim Status [276 and 277 transactions]*.  "The 276 is the transaction for provider inquiries about claim status.  The 277 transaction for health plan responses about claim status."  *See* Claim Status Basics, available at https://www.cms.gov/files/document/claim-status-transactions.pdf.

37.     *Claims Payment and Explanation [835 transaction]*.  The 835 is the digital transaction that delivers claim payment details from the insurer to the provider.  The 835, like the 837, contains information such as what medical care is being reimbursed, and for what amount.  If the billed amount has been lowered or altered, the 835 also contains an explanation for any such adjustment.  The 835 also offers insurance details such as deductibles, co-pay amounts, healthcare claim splitting, co-insurers, and bundling.  "The adopted standard for ERA [Electronic Remittance Advice] transactions is X12 835 V5010.  Accredited Standards Committee X12 Health Care Claim Payment/Remittance Advice (835), Version 005010X221 and its associated Errata Documents [ ], the standard for data content of the CCD+Addenda Record."  *See* EFT and ERA: Electronic Funds Transfer and Electronic Remittance Advice Transactions Basics, available at https://www.cms.gov/files/document/electronic-funds-transfer-and-electronic-remittance-advice-transactions.pdf.

38.     As a covered entity, Aetna must comply with the HIPAA regulations.

39.     Consistent with the applicable regulations, Aetna employed the X12 5010 standard transaction data sets when it processed Aramark's employees' medical claims.

40.     In addition to payers, *i.e.*, self-funded health plan and health insurance companies, and providers, "EDI clearinghouses" play a critical role in enabling the electronic transmission of medical claims.  *See United States v UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 124 (D.D.C. 2022).  "In 2021, 97 percent of medical claims were submitted electronically, and 95 percent of

10

providers and 99 percent of insurers used EDI clearinghouses" to process those transactions.  *Id.* at 125.  A substantial amount of medical claims data flows through EDI clearinghouses—covering "the entire lifecycle of a claim—both pre- and post-adjudication." *Id.*  "Pre-adjudicated claims data include details about the provider, the patient, the employer group, the location of care, the diagnosis, the services and procedures rendered, and the billed amounts"; "[p]ost-adjudicated claims data [ ] include[s] even more information, such as details about the provider-payer contract, the payer's claims edits, the medical policy and benefit design, the final paid amount, and adjudication decisions." *Id.*

41.     In practice, the medical claim submission and claim process works as follows: After a provider treats a patient, a treatment record is created and a standard billing form—CMS-1500 Health Insurance Claim Form—or "HCFA" is prepared.  This is essentially a bill, invoice, or claim, prepared by the providers and submitted to Aetna.  In parallel, the information in the HCFA form is usually translated into a specific, regulation-required ANSI X12 5010 format EDI data, the 837.  As has become customary in the industry, Aramark transmits the EDI bill electronically to Aetna.

42.     Aetna publishes Companion Guides that provide instructions for electronic communications and supplemental information for creating transactions while ensuring compliance with ASC X12 instructions.

43.     Once the HCFA or 837 is transmitted to the insurance company, the insurance company must acknowledge receipt within two days.

44.     If Aetna accepts and processes the transaction (claim(s) and incurred charges), then it generates a document known as an "Electronic Remittance Advice" or an "835," which is a record of claims adjudication or adjustment and payment for the submitted claim.  An 835 is not a

rejection of the claim.  The 835 is then required to be transmitted to the provider's office and maintained by Aetna in the standard or original format for auditability.

45.     If Aetna rejects a claim, then it does not generate an 835.  Rather, it generates an EDI data record referred to as a "999" and transmits that to the provider's office.  A rejected claim also triggers the creation of a CCD+ Addenda in the amount of $0.00.

46.     When a provider bills Aetna for services or treatment, they follow the industry standard service and treatment codes, including Current Procedural Terminology ("CPT") codes, Diagnostic-Related grouping ("DRG") codes, and International Classification of Diseases ("ICD") codes.

47.     Aetna does not provide Aramark with the standard transaction data sets for the medical claims Aetna processes that are paid by Aramark.

**B.     Aetna Breached and Continues to Breach Its Fiduciary Duties**

48.     Aetna has pulled over $200 million from Aramark to pay medical claims since 2018.

49.     Aramark paid Aetna to police its claims.  Aetna did not do so.  Incomplete medical claims data for claims processed over an 18-month period demonstrates that Aetna made millions in estimated overpayments for claims containing abusive billing practices, payment errors, impossible pricing outliers, and non-covered services.  These practices are discussed below.

**1.     Aetna Caused Aramark to Pay Thousands of Improper, False, or Fraudulent Claims**

50.     Aetna approved over 3,400 claims that exhibit abusive billing practices.  This includes (a) claims with duplicate payments for the same services to the same provider for the same member, (b) submissions of claims that were untimely, (c) abusive drug testing, (d) COVID-19 testing abuse, and (e) errors in surgery claims.

51.     For example, Aramark identified numerous duplicate payments.  In one instance, Aetna approved a duplicate payment for sickle cell testing procedures, CPT codes P9040 and 85660, for the same date of service to the same hospital for the same member on the same date of service.  The first claim was received on 09/03/21 and paid on 02/26/22, and the second (duplicate) claim was received two months later on 02/19/22 and also paid.

52.     In another example, Aetna approved claims for excessive payments for COVID-19 tests.  In one instance, Aetna approved reimbursement for a COVID test for $918, using CPT 0202U.  CPT code 0202U applies to only one unique lab test made by a specific manufacturer or performed by a specific lab.  For this claim, the provider billed for the proprietary lab test, resulting in a charge over nine times the typical rate, which Aetna approved the same day it was billed.  The typical price for a COVID test for possible exposure for Aramark members is between $75 and $100.  Many carriers reject reimbursement for CPT code 0202U for COVID testing following substantial abuse of the code.

53.     Aetna paid over 2,200 fraudulent or improper claims for drug tests and COVID-19 tests without review and almost immediately after they were submitted, including paying as much as $1,195 for a basic drug test.  Aetna approved expensive COVID test billing codes intended to be specific to hospital outpatient clinics, even when the submitting facility was an inpatient detox facility—further indicating that Aetna did not review these claims prior to payment.

54.     Aetna also approved claims containing clear surgical session errors.  During surgical sessions, both the surgeon performing the service and the facility where the surgery occurred are allowed reimbursement for their respective role in performing the surgery.  The surgery codes that the hospital bills are expected to match the codes that the surgeon bills.  In one

of many examples, Aetna approved a claim from an outpatient surgical procedure in which the hospital billed an additional service that the surgeon did not bill.

55.     Aetna's failure to police these abusive claims resulted in Aramark being overbilled by millions.  Aetna used Aramark funds to pay the vast majority of these claims automatically, often within days, without any review by Aetna.  Many of these claims are associated with particular providers with whom Aetna has explicit or informal agreements not to scrutinize their claims or to scrutinize only a limited number of the claims they submitted to Aetna.

### 2.  Aetna Approved Payment of Dummy Codes to Pay Subcontractors

56.     The Agreement permits Aetna to use subcontractors or other contracted parties to provide the required services.  The Agreement, however, does not permit Aetna to bill Aramark for additional or incremental fees associated with the services provided by those subcontractors or other contracted parties.  Aetna has, in the past, been found to have used "dummy" codes to pay subcontractor fees from the medical claims fee flow.  *See e.g.*, *Peters v. Aetna, Inc.*, No. 1:15-cv-00109-MR, 2023 WL 3829407 (W.D.N.C. June 5, 2023) (certifying class where Aetna's subcontractor arrangement allowed for charging a fee greater than allowed by the plan contract and served to hide the excess fees from the plan and members by misidentifying these fees as part of a claim for services).  Aramark's investigation is not complete, but the incomplete medical claims data shows that Aetna paid with Aramark funds claims with improbable, nonsense, undefined, or gibberish codes, like the ones used to compensate subcontractors in violation of Aetna's fiduciary obligations.

### 3.  Aetna Caused Aramark to Pay for Rehabilitation Center Abuse

57.     For the 18-month period of incomplete medical claims data Aramark reviewed, Aramark now understands that it was the victim of a number of instances of a well-known fraudulent billing scheme known as the "Rehab Riviera," that Aetna should have caught, but did

4894-6144-9881

not.  To execute this scheme, unscrupulous operators of high-end rehabilitation facilities recruit or

have agents recruit people with addiction issues and with good health insurance to engage the

services of various in-patient rehabilitation centers and sober living houses so that the facilities

can repeatedly bill the patient's insurance company.  The care provided at these locations is rarely

effective because it relies upon a returning patient or a patient repeatedly rotated through loosely

affiliated rehabilitation centers.  In other words, for the scheme to work, the "rehabilitation" for

which Aramark pays is designed to be ineffective.

58.     The Orange County Register described the "scheme" as follows:

> Patient recruiters typically receive payment from the rehab centers for each patient
> that generates revenue.   Predatory marketing practices often involve a
> misrepresentation of the services and the auctioning of patients through
> clearinghouses.  The clearinghouses route the patients to call centers, and once the
> patient's insurance if verified, the clearing centers act as brokers auctioning off the
> patients to the highest bidding rehab centers. . . . Rehab operators have told to the
> Southern California News Group that they know it's wrong to offer money to
> middlemen in exchange for well-insured patients, but that the practice is so
> ubiquitous in California they'd have no patients at all if they stuck to the high
> ground. . . . Addicts start to see their insurance cards as credit cards, operators said,
> demanding better food, cell phones, even cash from providers in exchange for
> staying in treatment.  If the provider doesn't deliver, the addict bolts to a different
> treatment center that will give him what he wants."[3]

59.     In one instance, Aetna paid over $225,000 in Plan funds for a patient who traveled

250 miles from the patient's home to Southern California to be shuffled through treatment in

multiple out-of-network inpatient facilities.  Dozens of in-network rehabilitation programs are

within 25 miles of the patient's home zip code.  In addition to costs of the California facilities,

within this same claim the Plans were also billed for extensive and expensive COVID and drug

[3] *Rehab Patient Brokering is Rampant, but It's Hard to Stop, Industry Says*, ORANGE CNTY. REG.
(May 30, 2017), available at https://www.ocregister.com/2017/05/30/rehab-riviera-in-addiction-
industry-even-simple-fixes-are-hard/; *How Many Body Brokering Cases Have Been Prosecuted
by the Feds Under New Law*, ORANGE CNTY. REG. (Mar. 12, 2020), available at
https://www.ocregister.com/2020/03/12/how-many-body-brokering-cases-have-been-prosecuted-
by-the-feds-under-new-law/.

15

testing, exceeding $45,000.  In a separate instance, another member from Indiana spent several months receiving out-of-network, inpatient services in Southern California, costing the Plan over $100,000.  Several of these facilities, including Dana Point Detox Center, Southern California Recovery Centers Oceanside, and the billing psychologist, Dr. Hedieh Azadmehr, appeared in both example claims.  By failing to catch these claims, Aetna effectively ensures the covered patients with substance abuse issues are not able to get the treatment they actually need.[4]

### 4. Aetna Caused Aramark to Pay Thousands of Excessive, Inflated, and Unjustifiable Claims

60.     Between June 2020 and December 2021, Aetna also approved nearly 2,000 claims with facially faulty pricing.  These include instances where the claim (a) was greater than the billed amount, (b) had inexplicably high prices for facility services, (c) was paid to in-network providers over 5 times Medicare standard pricing, (d) had surgical assistants paid at higher rates than primary surgeons, and (e) had extreme pricing variation relative to the amount the provider was regularly paid for the same services.  Aetna's failure to police these claims cost Aramark millions.

61.     In one example, Aetna caused Aramark to pay extreme variations in pricing for the same in-network services to the same provider.  A Plan Participant visited a specific emergency room five times between July 2020 and January 2022, with the in-network hospital submitting claims using the same CPT code with only slight increases in price.  For contracted in-network providers, some adjustments in price over time are expected.  But Aetna approved the claims inconsistently, paying the last two claims at triple the rates of the first three claims: from $840 per

---

[4] Aetna recently filed its own lawsuit against several of these facilities, alleging that multiple substance abuse treatment programs in Southern California "targeted vulnerable Aetna members who suffer from alcohol and/or substance dependency issues as part of a concerted effort to profit at their expense."  Complaint ¶ 5, *Aetna Life Ins. Co., Aetna Health of California v. Young et al.*, 2:23-cv-09654-MCS-JPR (C.D. Cal. Nov. 14, 2023).

visit to $2,400.  When the price for a specific service varies significantly within the same calendar

year, an error in payment is likely.  The amount paid was nearly double the amount actually billed.

62.    Aetna also routinely approved in-network provider claims at rates far exceeding

Medicare pricing.  An in-network claim paid at more than five times Medicare pricing is

exceptionally high; it is a significant pricing outlier for a participating provider.  In one example,

an orthopedic surgeon billed the Plans $33,110 under CPT code 27130, indicating professional

charges only for a total hip replacement.  This code has a Medicare 2020 allowed amount

maximum of $1,546.  Aetna used Plan funds to pay an in-network provider over *twenty-one times*

the price of Medicare for an in-network procedure.

63.    Aetna often paid claims in amounts greater than the amount the provider actually

billed.  In one instance, a hospital billed $18,855 for services related to a heart procedure and Aetna

caused Aramark to pay over $35,000 for the claim, nearly double the billed charges.

### 5.    Aetna Caused Aramark to Pay for Uncovered Claims

64.    During the same period, Aetna approved over 1,000 claims for services that were

not covered by the Plans.  The Plans do not cover every potential medical service or procedure.

Not only is Aetna aware of these exclusions, Aetna assisted Aramark in preparing the documents

that identify treatments or procedures excluded from medical insurance coverage.  Such exclusions

include cosmetic surgery, non-FDA approved or experimental treatments, vitamins, supplements,

and over-the-counter medicine.    Aramark also found instances where Aetna approved

inappropriately high facilities fees for telehealth services where the facility incurs minimal to no

cost.  In one example, Aetna approved a $9,648 claim for telehealth services.

### 6.    Aetna Caused Aramark to Pay for Thousands of Impossible Claims

65.    Aramark found millions in payment errors during the period of June 2020 to

December 2021, including medically unlikely edits and subrogation errors.  Many of the claims

17

Aetna approved without review are medically unlikely, a euphemism for medically impossible.  In one instance, Aramark noted a professional doctor's billing for a hysterectomy from out-of-network providers.  In this claim, the primary surgeon appears to be Dr. Karen Waldrep, but a second surgeon, Dr. Angela Walker, billed as both a primary surgeon *and* as an assistant surgeon.  Aetna approved the claim for payment and it was paid.  This claim, and claims like it, were all adjudicated automatically, quickly, and without human intervention.

### 7.     Aetna Has Failed to Provide Subrogation Services

66.     Aetna also agreed to provide subrogation services.  A claim is subject to "subrogation" if another party, besides Aramark, is responsible to pay for the medical services provided.  For example, in the case of a car accident, the responsible auto insurance company should pay, not Aramark.  If the patient was treated for an "on-the-job" injury then the responsible worker's compensation fund should pay for the care, not Aramark.  Aetna approved and Aramark overpaid many, many claims that should have been subject to subrogation.

### 8.     Aetna Caused Aramark to Pay for Hundreds of Emergency Room "Super Users" Without Notifying Aetna

67.     Aetna regularly paid claims for emergency room ("ER") visits that were improper and abusive.  ER overutilization and upcoding are increasing trends among health care services.  For example, a high-level office visit costs $200 in comparison to an approximately $3,000 non-emergency ER visit.  ER services accounted for about 15% of the Plans' total annual spend.  Studies have shown that a small percentage of "superusers"—members that have more than five ER visits in a year—tend to drive these costs and even a small improvement in shifting habitual ER users to providers' offices or urgent care centers would result in substantial cost reductions for Aramark.  Between June 2020 and December 2021 alone, the claims data identified over 35

18

superusers Aetna did not identify and for whom Aetna paid claims with Aramark funds without review.

### C.     Aetna Engages in Post-Adjudication Adjustments Which Harm Aramark

#### 1.     Aetna Engages in Cross-Plan Offsetting

68.     Aetna engaged in cross-plan offsetting while serving as TPA for Aramark to the detriment of Aramark.

69.     Cross-plan offsetting often benefits Aetna and its own fully-insured plan at the expense of a self-funded plan, like the Plans.

70.     To cross-plan offset, Aetna overpays a provider using funds from the Plans.  Rather than collect the overpayment back from the provider, Aetna simply deducts the overpaid amount from the next payment to the provider.  Often, however, the "next" reduced payment comes from a different plan such that the reduced amount of the "next" payment does not benefit the Plans.  Instead, that "next" payment comes from either another self-funded plan or, most frequently, one of Aetna's fully-insured plans.  So, another self-funded plan or—in most cases—*Aetna itself* gets the benefit of the reduced payment amount.

71.     For example, Doctor X treats a patient covered by the Plan.  Doctor X submits a claim for payment to Aetna in the amount of $1,000.  Aetna reviews the claim and pays Doctor X $1,000 for the service.  Aetna later decides that it should have paid Doctor X $600.  Aetna does not ask Doctor X for a refund.  Rather, Aetna waits until Doctor X treats another patient covered by an Aetna fully-insured plan—rather than the Plan.  Doctor X submits a claim for payment to Aetna for $1,000 for treating a second patient.  Aetna reviews the claim and decides Doctor X should be paid $600.  Rather than paying Doctor X $600 for treating the second patient, Aetna deducts the $400 overpayment on the first patient and pays Doctor X $200 for the second patient.  Aetna never refunds to the Plan or credits the Plan the $400 that Aetna initially overpaid for

treating the first patient in this example.  Aetna uses cross-plan offsetting to get Aramark's self-funded Plans to illicitly subsidize its fully-insured book of business.

72.     Aetna benefits from cross-plan offsetting to the detriment of the Plans, in breach of Aetna's fiduciary obligations to the Plans.  Aetna's practice of cross-plan offsetting has already been held to be unlawful and a violation of ERISA.  *See Lutz Surgical Partners PLLC et al. v. Aetna, Inc. et al.*, No. 3:15-cv-02595 (BRM)(TJB), 2021 WL 2549343, at *15–18 (D.N.J. June 21, 2021) (concluding "Aetna's cross-plan offsetting is prohibited by ERISA"), *vacated*, 2023 WL 2472403 (D.N.J. Feb. 8, 2023).

## 2.     Aetna Reprocesses Claims to the Detriment of Aramark

73.     On information and belief, Aetna takes funds from the Plans in an amount close to the provider-billed amount or the amount the provider is owed pursuant to an in-network agreement.  Then, Aetna frequently reprocesses the claims.  It does this for one reason: to adjudicate the claims at an amount lower than the amount taken from the Plans.

74.     As a result of the reprocessing, Aetna uses the lower, reprocessed amount to justify paying the provider less than the billed amount or the amount Aetna otherwise would be contractually required to pay the provider.

75.     By reprocessing a claim, Aetna obtains negotiating leverage over the provider because this practice, whether justified or not, results in substantial delay of any payments to the provider.

76.     It is not uncommon for Aetna to "reprocess" claims multiple times.  As part of its reprocessing, Aetna frequently alters the claim number so that the claim cannot be tracked accurately or traced as required by the applicable regulations.  For example, Aetna's convention is to process (and reprocess) claims electronically.  Such processed and reprocessed claims have an "E" prefix or leading character.  If Aetna is not able to extract the agreement or concession from

the provider to take a reduced rate for the claim, then Aetna replaces the "E" prefix or leading character of the claim identification number with a "P"—presumably for "paper"—and reprocesses the claim as a "paper" claim.  This practice disconnects the original electronic claim from the "paper" claim and interferes with the tracing or audit trail associated with the original claim.  Eventually, either Aetna does not pay the reprocessed claim or it pays the reprocessed claim at a significantly reduced rate.

77.     Aetna never refunds or credits to the Plans the difference between the amount removed from the Plans' accounts and the amount ultimately paid to the provider pursuant to the reprocessed claims.

78.     Aetna's retention of that difference violates its obligations as a fiduciary under ERISA.

### 3.     Aetna Takes More from the Plans Than It Pays Out-of-Network Providers

79.     Aetna has obtained undisclosed fees from the Plans under false pretenses.  When Aetna receives a claim from an out-of-network provider, it frequently engages a "repricing" company or companies to negotiate a lower amount that Aetna ultimately pays the providers.  On information and belief, Aetna uses Zelis Healthcare Corp., MultiPlan Corp., and Global Claims Services.  Global Claims Services is owned by Aetna, has common ownership with Aetna, or is affiliated with Aetna more closely than through an arms-length contractual arrangement.

80.     The providers want to be paid—and should be paid—for treating Aramark employees and their families.  Aetna wants to pay the providers as little as possible.  The repricing companies have one job: to delay payment until the provider's biller relents and agrees to accept an amount well below the billed amount and well below what Aetna wrongfully obtained from the Plans.  If one repricing company is not making headway with a provider, then Aetna shifts the

21

claim to another repricing company, and then another, and then another.  Aetna has not disclosed to Aramark that the repricing companies are subcontractors or that they are engaged in the claim adjudication and provider payment process.

81.     Aetna's use of repricing companies confirms its practice of taking more funds from the Plans than it pays to providers.  Aetna's agreements with the repricing companies require it to pay them a percentage of the amount they "save," *i.e.*, a bounty.  Aetna pays the repricing companies from the excess funds it wrongfully obtains from the Plans.  Aetna does not pay the repricing companies their "bounty" from its monthly per-employee fee.  Rather, Aetna extracts the "fee" for the repricing companies from the amounts it seeks and obtains from Aramark to pay provider medical claims.

82.     Management and representatives of the repricing companies are aware that Aetna acts as the Plans' TPA.  Management and representatives of the repricing companies are aware that Aetna pays its "bounty" or "success fee" from an Aetna account or accounts containing funds from the Plans.  Management and representatives of the repricing companies are aware that Aetna obtains money from the Plans before it knows how much a provider will ultimately be paid.  Management and representatives of the repricing companies are aware that Aetna does not refund, credit, or offset to the Plans amounts that the repricing companies save.

**D.     In Direct Violation of ERISA, Aetna Commingles Plan Funds with Its Own Funds**

83.     For many of these schemes to work, Aetna moves funds from the Plans' accounts into Aetna's own account containing Aetna's funds and the funds of other Plans.  Because Aetna is an ERISA fiduciary, such commingling is not permitted.

84.     As a TPA and an ERISA fiduciary, Aetna is supposed to make payments from an account owned and controlled by the Plans.  Aetna is supposed to write checks from or make ACH

transfers from the Plans' accounts to a doctor or hospital that cared for a beneficiary of one of the Plans.

85.     In practice, that did not happen.  Aetna directs the Plans to fund their accounts in certain bulk and undifferentiated amounts.  Aetna transfers funds from the Plans' accounts not to providers, but to an account or accounts owned and controlled by Aetna or one of its affiliates. Aetna then makes payments to providers from the Aetna account or accounts.  The Plans have no access to these accounts, so they do not know—and have no way to determine—exactly how much the providers receive for specific claims and whether that matches the amounts the Plans transferred to Aetna for those specific claims.

**E.     Aetna Applies Less Rigorous Claims Adjudication Standards to Self-Funded Plan Claims Than It Applies When Adjudicating Claims for Its Own Fully Funded Plans**

86.     As an ERISA fiduciary, Aetna is required to treat claims submitted to the Plans like it treats claims submitted to its fully-insured plans.  Aetna does not do this.  Aetna applies rigorous standards for accepting, processing, and paying claims submitted to its fully-insured plans where Aetna is paying claims with its own money.  As a result of applying these rigorous standards, Aetna has a high rejection rate for claims submitted to its fully funded plans for payment.

87.     Aetna proudly declares in fraud resources available online that it takes a "zero-tolerance approach to fraud."  Aetna even has an entire section of its website dedicated to "Fraud and Abuse."  According to Aetna, estimated financial losses caused by insurance fraud "run in the tens of billions of dollars each year."  *Aetna Special Investigations Unit*, AETNA 1, 2, available at https://www.aetnafeds.com/pdf/FraudBrochure.pdf.

88.     Aetna claims to "lead the fight against fraud" through its "Special Investigations Unit," which is dedicated to "aggressively investigating all types of fraud using the latest detection, investigation and recovery techniques."  Aetna claims that "[w]hether taking on large health care

23

management companies or individual providers, we work to protect you."  According to Aetna, its Special Investigations Unit "saves and recovers hundreds of millions of dollars related to fraud, waste, and abuse."  Aetna states that customers can "count on us to fight for you and everyone affected by fraud, day in, day out."  *Id.*

89.     Aetna asserts that "reliable fraud detection relies heavily on technology" and its Special Investigations Unit "goes a step beyond with dedicated IT staff and [its] own systems capability" in order to "gather a huge volume of claims data all in one spot."  This way, Aetna claims, it can "use advanced software to comb through massive amounts of data" then "identify providers whose claims appear unusual or inconsistent with their peers.'"  *Id.*

90.     Examples of "red flags" Aetna claims it investigates to catch provider fraud include: "unusual provider billing practices;" "billing patterns that are inconsistent with those of peers;" "discrepancies between billed services and patient records;" "unusually high volume or percentage of same services;" "pressure to pay claims quickly;" and "provider advertisements for 'free' services or other incentives."  *Id.* at 3.  As explained in detail above, those are the exact type of claims for which Aetna has approved payment.

91.     But when Aetna is not responsible for paying claims with its own money, and instead pays claims with money from self-funded plans, like the Plans, Aetna applies far less rigorous standards for accepting, processing, and paying claims submitted for payment.  On information and belief, as a result, the claim rejection rate for a self-funded plan generally, and the Plans specifically, is lower than the rate for Aetna's fully-insured plans.

92.     By prioritizing its own assets and resources to the detriment of the Plans', Aetna has breached and continues to breach its fiduciary duty to the Plans.

24

93.     Moreover, as part of the Agreement, Aetna has committed to recover overpayments; to make recoveries for subrogation and coordination of benefits; and to police fraud, waste, and abuse for the benefit of the Plans.  Aetna even has specific departments devoted to these activities.

94.     Aetna did not apply the above-described fraud prevention investigations, techniques, and technology to identify and prevent the payment of fraudulent or otherwise improper claims made to the Plans, or did not apply those fraud prevention investigations, techniques, and technology as stringently as they did with claims made to Aetna's own insurance plans.

95.     Aetna's failure to employ these fraud prevention investigations, techniques, and technology adequately, or do so as stringently as it does with claims made to its own insurance programs, violates both its fiduciary duty to "process claims for Plan benefits incurred on or after the Effective Date using Aetna's normal claim determination, payment and audit procedures and applicable cost control standards . . . ."

**F.     Aetna Uses Exclusion Lists as a Means to Limit the Scrutiny Applied to Aramark's Claims**

96.     Aetna employs a tactic, strategy, or procedure that involves "exclusion lists."  To induce providers to join Aetna's network of providers and enter "in-network" agreements, and perhaps for other reasons, Aetna agrees to place providers on "exclusion lists."  A provider on this list benefits because being on this list commits Aetna to providing no scrutiny or limited scrutiny to the claims those providers submit for reimbursement.  Or, it commits Aetna to scrutinize and properly adjudicate only a small number or a small percentage of the claims the listed provider submitted for adjudication.

97.     Discovery will show that Aetna uses exclusion lists and consequently applied limited scrutiny to certain claims for which Aramark ultimately paid.  Even the incomplete claims data shows that Aetna regularly processes claims from specific providers quickly, with no review, and with minimal revisions or adjustments, if any, to the amounts the provider billed.

98.     At no point did Aetna disclose the use of exclusion lists to Aramark.  Nor did it disclose that claims for payment submitted to Aetna related to the case and treatment of Aramark employees would not be reviewed or scrutinized.

**CLAIM ONE**

**Breach of Fiduciary Duty under ERISA**
**(29 U.S.C. §§ 1104(a) and 1109(a))**

99.     Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

100.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1104(a), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

101.    As the claims administrator to the Plans, Aetna is an ERISA fiduciary and thus owes the Plans, Plan Participants, and Aramark a fiduciary duty to discharge its obligations to the Plans "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

102.    Aetna also owed a separate and independent fiduciary duty to discharge its obligations in accordance with the terms of the Plans' documents.  *See* 29 U.S.C. § 1104(a)(1)(D).

103.    Aetna breached its fiduciary duties as set forth herein.

26

104.    Aetna further breached its fiduciary duties by approving claims for benefits that contained indicia of fraud without first determining (either through an investigation or otherwise) that the claims were legitimate, non-fraudulent and covered by the Plans.

105.    Aetna further breached its fiduciary duty by not recovering from providers amounts paid pursuant to fraudulent or otherwise improper claims.

106.    Aetna's breach of its fiduciary duty resulted in improper payments of fraudulent or otherwise improper claims by Aramark on behalf of the Plans.  These losses were ultimately suffered by Plaintiffs.

107.    Aetna has profited an undetermined amount due to its breach of its fiduciary duties.

108.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna's breach of its fiduciary duty, (ii) the recovery of any and all benefit or profits Aetna made as a result of its breach of its fiduciary duty, (iii) all such other equitable or remedial relief as may be appropriate, and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

**CLAIM TWO**

**Prohibited Transactions Under ERISA**
**(29 U.S.C. §§ 1106(a)(1)(D) and 1109(a))**

109.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

110.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(a)(1)(D), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

111.    Aetna is an ERISA fiduciary.

27

112.     The health care providers and other parties to whom Aetna made payments pursuant to claims for health benefits that it approved are "parties in interest" under ERISA because they provided or purported to provide "services" to the Plans.

113.     By approving and paying fraudulent or otherwise improper or uncovered claims to such parties in interest, Aetna engaged in "prohibited transactions" by causing the Plans to engage in transactions that Aetna either knew or should have known constitute a direct or indirect transfer to or use by or for the benefit of a party in interest of assets of the Plans.

114.     Neither the Plans nor Aramark received adequate consideration for the amounts that were paid for these prohibited transactions.

115.     In addition, Aetna retained for itself and transferred to itself monies from the Plans to which it had no lawful right.  Aetna further transferred some portion of Plans' money wrongfully retained or obtained to its affiliates, to its subcontractors, and to other third parties as compensation for their participation in the scheme, pattern and practices employed by Aetna to obtain and retain monies from the Plans to which it had no lawful right.

116.     Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna having engaged in prohibited transactions, (ii) the recovery of any and all benefit or profits Aetna made as a result of having engaged in prohibited transactions, (iii) all such other equitable or remedial relief as may be appropriate, and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

### CLAIM THREE

### Breach of Fiduciary Duty Under ERISA
### (29 U.S.C. §§ 1106(b)(1) and 1109(a))

117.     Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

28

118.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3), 1106(b)(1), and 1109(a).  Plaintiffs have standing to bring this Claim under these provisions because they are ERISA fiduciaries.

119.    As claims administrator for the Plans, Aetna is a fiduciary under ERISA, and thus owes fiduciary duties to Aramark.  ERISA forbids a fiduciary from engaging in self-dealing.  *See* 29 U.S.C. § 1106(b)(1).

120.    Aetna controlled and continues to control the adjudication, pricing, repricing, reprocessing, and payment of health care provider claims through an adjudication process.

121.    As a fiduciary, Aetna was required, among other things, to discharge its duties solely in the interest of the participants and beneficiaries of the Plans, to preserve the Plans' assets, and to disclose fully its actions and any compensation it was taking for its services.

122.    As set forth herein, Aetna breached its fiduciary duties by engaging in a variety of wrongful acts and practices.

123.    Additionally, Aetna has made profits of an undetermined amount due to its breach of duty of loyalty and care.

124.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna's breach of its fiduciary duty, (ii) the recovery of any and all profits or benefit that Aetna made as a result of its breach of its fiduciary duty, (iii) all such other equitable or remedial relief as may be appropriate, and (iv) the recovery of Plaintiffs' attorneys' fees and costs.

### CLAIM FOUR

**Prohibited Transactions Under ERISA**
**(29 U.S.C. §§ 1106(b)(3) and 1109(a))**

125.    Plaintiffs reallege and incorporate by reference each and every allegation contained herein.

29

126.    Plaintiffs bring this Claim under 29 U.S.C. §§ 1132(a)(2), (a)(3) and 1109(a). Plaintiffs have standing to bring this Claim under these provisions as ERISA fiduciaries.

127.    As claims administrator for the Plans with discretion over Plan administration and Plan assets, Aetna is a fiduciary under ERISA.  As a fiduciary, Defendant is prohibited from "receiving any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the plan."  *See* 29 U.S.C. § 1106(b)(3).

128.    By retaining the difference between the negotiated price for medical services rendered and the monies withdrawn from the Plans, and collecting "savings" and "reprocessing" fees, Aetna received consideration from parties transacting with the Plans constituting "prohibited transactions."  Among other things, Aetna used its control of the assets of the Plans, the negotiation of the price paid for medical services, and the engagement of "repricing" companies to improperly receive and retain monies from the Plans.

129.    Aetna retained for itself and transferred to itself monies from the Plans to which it had no lawful right.

130.    Neither the Plans nor Aramark received adequate consideration for the amounts that were paid for these prohibited transactions.

131.    Accordingly, Plaintiffs seek (i) the recovery of any and all losses resulting from Aetna having engaged in prohibited transactions, (ii) the recovery of any and all profits that Aetna made as a result of having engaged in prohibited transactions, (iii) all such other equitable or remedial relief as the court may deem appropriate, and (iv) the recovery of Plaintiffs' attorney's fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court issue a final judgment:

a.    ordering Defendant to reimburse Plaintiffs for any and all losses resulting from Defendant breaching its fiduciary duties and/or having engaged in prohibited transactions;

b.    ordering Defendant to disgorge to Plaintiffs any and all profits that Defendant made as a result of its breaches of fiduciary duties and/or having engaged in prohibited transactions;

c.    a preliminary injunction compelling Defendant to provide all Plan claims data (subject to appropriate privacy protections);

d.    granting all such other equitable or remedial relief as the Court may deem appropriate; and

e.    ordering Defendant to pay Plaintiffs their attorneys' fees and costs.

Dated: December 22, 2023

/s/ Jennifer Truelove
Jennifer Truelove
Texas Bar No. 24012906
MCKOOL SMITH, P.C.
jtruelove@mckoolsmith.com
104 East Houston Street, Suite 300
Marshall, TX 75670
Telephone: 903-923-9000
Telecopier: 903-923-9099

Jon Corey
D.C. Bar No. 491311
jcorey@mckoolsmith.com
MCKOOL SMITH, PC
1999 K Street, N.W., Suite 600
Washington, DC 20006
Telephone: (202) 370-8300
Facsimile: (202) 370-8344

David I. Schiefelbein
New York State Bar No. 4767398
dschiefelbein@mckoolsmith.com

31

Emily B. Tate
New York State Bar No. 5769153
etate@mckoolsmith.com
MCKOOL SMITH, PC
One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

**Attorneys for Plaintiffs Aramark Services, Inc. f/k/a Aramark Corporation, Aramark Services, Inc. Group Health Plan, Aramark Uniform Services Group Health and Welfare Plan, and Aramark Benefits Compliance Review Committee**